JOHN M. MCCOY III, Cal Bar. No. 166244
Email: mccoyj@sec.gov
FINOLA H. MANVELIAN, Cal. Bar No. 180681
Email: manvelianf@sec.gov
JESSICA R. PUATHASNANON, Cal. Bar No. 208074
Email: puathasnanonj@sec.gov
BERNARD B. SMYTH III, Cal. Bar No. 217741
Email: smythb@sec.gov

Attorneys for Plaintiff
Securities and Exchange Commission
Rosalind R. Tyson, Regional Director
Andrew G. Petillon, Associate Regional Director
5670 Wilshire Boulevard, 11th Floor
Los Angeles, California 90036
Telephone: (323) 965-3998
Facsimile: (323) 965-3908

FILED
CLERK, U.S. DISTRICT COURT
JAN - 8 2010
CENTRAL DISTRICT OF CALIFORNIA
BY                        DEPUTY

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

SECURITIES AND EXCHANGE COMMISSION,

    Plaintiff,

vs.

NEWPOINT FINANCIAL SERVICES, INC.; JOHN FARAHI; GISSOU RASTEGAR FARAHI; and ELAHEH AMOUEI,

    Defendants,

    and

TRIPLE "J" PLUS, LLC,

    Relief Defendant.

Case No. CV10 0124 DDP (JEMx)

**DECLARATION OF EDMOND TAHMASIAN IN SUPPORT OF *EX PARTE* APPLICATION BY PLAINTIFF SECURITIES AND EXCHANGE COMMISSION FOR TEMPORARY RESTRAINING ORDER AND ORDERS: (1) FREEZING ASSETS; (2) APPOINTING A TEMPORARY RECEIVER; (3) REQUIRING ACCOUNTINGS; AND (4) PROHIBITING THE DESTRUCTION OF DOCUMENTS; AND ORDER TO SHOW CAUSE RE PRELIMINARY INJUNCTION AND APPOINTMENT OF A PERMANENT RECEIVER**

# **DECLARATION OF EDMOND TAHMASIAN**

I, Edmond Tahmasian, pursuant to 28 U.S.C. § 1746, declare as follows:

1. I have personal knowledge of each of the matters set forth below and I make this Declaration at the request of the United States Securities and Exchange Commission ("SEC").

2. I am 35 years old and reside in Glendale, California. My brother, Edvin Tahmasian Savarani, and I moved from Iran to the United States in 1999.

3. I first learned of John Farahi sometime around 2000 after hearing his radio program on the Iranian radio station, KIRN. On his radio program, Mr. Farahi said that his company was offering certificates of deposit (CDs) at favorable interest rates.

4. In March of 2001, my brother and I met with Mr. Farahi at his offices in Beverly Hills, California to discuss investing in the CDs he had mentioned on the radio. Mr. Farahi told us that the CDs were for a one-year term and were FDIC insured. He did not mention anything regarding any risks associated with investing in the CDs. Based on our discussions with Mr. Farahi, my brother and I invested approximately $30,000 in what we were told were CDs. We were not provided with any other documentation regarding our investment. Because we were told it was an investment in CDs, and because Mr. Farahi said the CDs would be FDIC insured, I believed that our investment involved a low degree of risk.

5. I went back to Mr. Farahi's offices in 2002 (on or around the maturity date of the CDs my brother and I purchased in 2001). I met with Mr. Farahi and discussed re-investing the principal and interest in one-year CDs. Mr. Farahi said that I could keep the investment with his company, but that the interest rate would be different. He did not say that any other aspects of the investment would be different. After speaking with Mr. Farahi, I decided to re-invest the principal and interest and to add several thousand more dollars to the CDs as well.

6. As I did in 2001 and 2002, each time the CDs I invested in reached

1

their maturity date, I would speak to Mr. Farahi or Elaheh Amouei at NewPoint Financial Services ("NewPoint") to have them re-invest the principal and generally also the interest. Although the interest rate would usually change when I re-invested, I was never told that any other aspect of my investment would be different. Each time I understood that I was investing in CDs. On occasion I would also add money to my investment. In total, I invested more than $100,000 with NewPoint.

7. Other than some paperwork my brother and I filled out one occasion at NewPoint's offices, the only documents I have been provided by Mr. Farahi or anyone at NewPoint have been one or two page documents. For example, I have received letters stating how much I had invested, the interest rate and the maturity date. On occasion, I also received account statements. Attached as Exhibits 1, 2, and 3 are true and correct copies of documents that I was shown by the SEC staff. I have reviewed the documents. I never received any of the three documents or any similar documents from Mr. Farahi or anyone else at NewPoint.

8. In late 2008, after hearing news reports regarding the financial crisis and that many financial institutions might fail, I called NewPoint to ask about the safety of my investment. I spoke with Ms. Amouei. She told me that NewPoint was in good financial condition because it did not take the same risks as many other financial institutions. Around that time, I heard Mr. Farahi state on his radio program that NewPoint was safe and secure and had been fortunate not to encounter many of the problems that other financial institutions were encountering. My conversation with Ms. Amouei and Mr. Farahi's comments on the radio assured me that my investment was safe.

9. In or around July or August 2009, I received a call from Mr. Farahi. I was surprised to receive a call from him, because I had not spoken to him in at least a year or two and I had not contacted NewPoint since my conversation with Ms. Amouei in 2008. Mr. Farahi told me that someone might be calling me to ask

questions about my investment at NewPoint. Mr. Farahi told me that if someone did call to tell them that I received all the paper work they ask about. Mr. Farahi specifically said to tell them that I received a copy of the "PPOM." I had never received a copy of a "PPOM" and, in fact, did not even know what the "PPOM" was. Mr. Farahi's call alarmed me and I asked him what was going on. He told me that he had some issues with somebody, but did not explain further.

10. Approximately 2 or 3 weeks after Mr. Farahi called me, I received a call from an attorney. The attorney identified himself as Russell and said that he represented NewPoint. He asked me a number questions regarding my investment with NewPoint. He asked me whether I had received a copy of a "PPOM." I told him that I had not. I also told him that I understood my money was invested in CDs. He told me that the investments were actually debentures. That was the first time I learned that my money at NewPoint was not invested in CDs although I did not really understand what debentures were.

11. Sometime after I spoke with NewPoint's attorney, I called NewPoint to ask about my investment. The maturity date for what I believed to be the CDs I invested in was in late September 2009. I was concerned by the calls I received from Mr. Farahi and from NewPoint's attorney and I wanted to know whether my money was still safe and whether I should withdraw it or re-invest it. I spoke with Ms. Amouei and asked her what was going on and whether my money was safe. She told me that the SEC was just conducting a routine examination and that there were no problems with my investment. She told me that my money was safe.

12. I was reassured by Ms. Amouei's comments and, about one to two weeks before the maturity date, I called NewPoint and asked Ms. Amouei to re-invest the principal of my investment but to withdraw the interest. Ms. Amouei responded that my principal would be invested as before and that she would send me a check for the interest. I received a check for the interest a few days later.

13. In late September 2009, I received a questionnaire from the SEC.

1 | When I received the questionnaire I again became concerned regarding the safety
2 | of my investment with NewPoint. I called NewPoint and spoke with Mr. Farahi.
3 | He told me that the questionnaire was voluntary and it was up to me whether to fill
4 | it out and return it to the SEC. I asked him what was going on and he told me that
5 | NewPoint did not have any problems. He said that no matter what happened to
6 | NewPoint, all the investors' money was safe.

7 |   14. On or around the end of October 2009, I received a check from
8 | NewPoint in the amount of approximately $32,000. I had not asked to withdraw
9 | any of my investment so I called NewPoint to ask why they had sent me the check.
10 | Ms. Amouei told me that they had decided to send some money back to investors
11 | but did not explain further. I then asked to withdraw all my money with NewPoint.
12 | She told me that one of NewPoint's creditors had freezed NewPoint's account and
13 | that NewPoint would not be able to pay me my money until that issue was
14 | resolved. To date I have not received the remainder of my investment.

15 |   15. At no point from the time I first invested to the present was I told by
16 | Mr. Farahi or anyone else at NewPoint that a portion of the money I invested
17 | would be loaned directly to Mr. Farahi. I would not have invested with NewPoint
18 | had I known that.

19 |   16. At no point from the time I first invested to the present was I told by
20 | Mr. Farahi or anyone else at NewPoint that a portion of the money I invested
21 | would be used to build a house in Beverly Hills, California for Mr. Farahi. I would
22 | not have invested with NewPoint had I known that.

23 |   17. At no point from the time I first invested to the present was I told by
24 | Mr. Farahi or anyone else at NewPoint that a portion of the money I invested
25 | would be used to trade in options in the stock market. In fact, in a conversation I
26 | had with Mr. Farahi in either 2002 or 2003, Mr. Farahi advised me not to buy
27 | stocks because he said investing in stocks was risky. I would not have invested
28 | with NewPoint had I known that a portion of the money I invested would be used

1 | to trade in options in the stock market.
2 |     18.    At no point from the time I first invested to the present was I told that my investment with NewPoint was speculative or involved a high degree of risk. I would not have invested with NewPoint had I known that.
5 |     19.    The money I have invested with NewPoint is the majority of my savings. If I lose that money it will be devastating to me financially.

    I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

    Executed this 17 day of December 2009 in Glendale, California.

_____
Edmond Tahmasian